UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUNNINGDALE VENTURES, INC.,          )
                                     )
              Plaintiff,             )
                                     )
         v.                          )
                                     )    CIVIL ACTION NO.
JAMES W. MARTIN JR., MARCIA          )    13-12512-DPW
MARTIN, MAUREEN MARTIN,              )
KELLY SOPER, and ANY AND ALL         )
OCCUPANTS,                           )
                                     )
              Defendants,            )
                                     )
         v.                          )
                                     )
EASTERN SAVINGS BANK, FSB,           )
                                     )
     Third-Party Defendant.          )


MEMORANDUM AND ORDER
March 31, 2018

     This case involves a homeowner, defendant James Martin,

who, like many during the recent recession, defaulted on his

mortgage.[1]  After a period of forbearance by his lender,

defendant-in-counterclaim Eastern Savings Bank, F.S.B.

("Eastern"), the parties were unable to agree regarding

modification and the property was foreclosed upon.  Plaintiff

Sunningdale Ventures, Inc. ("Sunningdale"), a subsidiary of

---

[1] The action is also brought against Marcia Martin, Maureen
Martin, Kelly Soper, and any and all occupants.  Following the
protocol of the parties, I will refer to Defendants in the
singular as "Martin," and the references will generally be to
actions or arguments by James Martin.

Eastern, now seeks possession of the foreclosed property under

Massachusetts state law.[2]  In response, Martin asserts a number

---

[2] Sunningdale based its possession claim when filed on the right
to foreclose pursuant to the statutory power of sale set forth
in the mortgage.  *See* Mass. Gen. Laws ch. 244, § 14 and ch. 183,
§ 21.  In a supplemental memorandum, filed after the argument on
the summary judgment motions, Sunningdale and Easton Bank added
reliance upon Mass. Gen. Laws ch. 294, § 1 for the proposition
that its foreclosure sale recorded by Certificate of Entry dated
May 1, 2013 had independently ripened into full title to the
property on May 1, 2016.  *See generally Singh* v. *207-211* Main
*St., LLC*, 937 N.E.2d 977, 979 (Mass. App. Ct. 2010).
  Massachusetts law recognizes that foreclosure under a
statutory power of sale and foreclosure by peaceable entry,
recording a certificate of entry and maintenance of peaceable
possession for three years after recordation, are independent
grounds standing alone that support possession.  *See U.S. Bank
Nat'l Ass'n* v. *Ibanez*, 941 N.E.2d 40, 49 n.15 (Mass. 2011);
*Grabiel* v. *Michelson*, 8 N.E.2d 764, 765 (Mass. 1937) (concluding
that because good title under the foreclosure of the mortgage by
entry existed, it was not necessary to consider whether there
was any irregularity in the foreclosure of the mortgage under
the power of sale).
  While bankruptcy court decisions in this District have
suggested that litigation proceedings interrupt "peaceable
possession," *see, e.g., In re Goulet*, No. 13-41812, 2015 WL
269269, at *7 (Bankr. D. Mass. Jan. 21, 2015) (commencing an
adversary proceeding prior to the expiration of the three year
period was sufficient to terminate the peaceable possession); *In
re Loucheschi LLC*, 496 B.R. 41, 46 (Bankr. D. Mass. 2013) ("the
commencement of an adversary proceeding challenging a mortgage
lender's right to be in possession of the mortgaged premises
interrupts the lender's peaceable possession); *In re Ledgemere
Land Corp.,* 116 B.R. 338, 341 (Bankr. D. Mass. 1990),
**(**mortgagee's "entry upon the premises, even though 'open and
peaceable,' is not enough" . . . "[t]he statute requires that
the entry be followed by 'possession . . . continued peaceably .
. .[,]' [but] [w]hat followed its entry [in *Ledgemere*] could
hardly be called peaceable, with threats of eviction, disputes
over who should receive rents, and, finally, litigation"), I am
of the view that the relevant challenge must be initiated by the
*mortgagee* within the three year period.  *See U.S. Nat'l Ass'n* v.
*McDermott*, 24 N.E.3d 1061 (Mass. App. Ct. 2015) (unpublished
opinion) (reaffirming that if a mortgagor wants to challenge a

of counterclaims based on the negotiation of his forbearance agreements. He claims that Eastern caused him to believe that his mortgage obligations would be permanently modified, that this misrepresentation lured him deeper into debt, and as a consequence, foreclosure improperly ensued. Sunningdale has moved for summary judgment. I summarize the facts in the light most favorable to Martin, as the party opposing summary judgment.

## I. FACTS

On December 19, 2003, Mr. Martin executed a note to Eastern in the amount of $260,000, secured by a mortgage on his home at 38 Hesper Street in Saugus, Massachusetts. By 2005, Martin was in default. In early 2009, Martin's financial situation worsened and he began discussing with Eastern options for easing payments on his mortgage. In February, Martin spoke with Eastern employee Gerald Feinstein by telephone, and told him that he could only afford monthly payments of $2,000, not the $3,124.19 his payment schedule then required.

In a letter dated February 10, 2009 to Martin, Feinstein

---

foreclosure by entry, "it is incumbent on him to do so before the three-year period has elapsed."). Martin did so here by asserting counterclaims in his answer. The alternative grounds of continued peaceable possession for three years following recordation of the Certificate of Entry, asserted by Sunningdale and Eastern in the Supplemental Memorandum, is not sufficient independently to support grant of summary judgment to them here.

referenced this telephone conversation, recounting that in the conversation "we advised you that we would look at a possible workout option to see if you will qualify for the program." In that letter, Feinstein also requested that Martin submit financial information to Eastern. A handwritten notation, the authorship of which is unclear on the record before me, but which for purposes of the motion before me I will ascribe to Eastern, reads: "$2000 per month/6 months - possible mod after fulfilled." Martin now states that he understood Eastern in this call to have offered an outright modification of his mortgage obligations, or at least to have had intimated that a modification would be forthcoming.

On March 6, 2009, after receiving Martin's financial information, an Eastern representative again spoke with Martin on the phone and again sent a confirmatory letter. This letter made clear that what was being offered was only a forbearance program in which Martin's monthly payments would be reduced, but that he would continue to accumulate debt. The letter was styled as a "Forbearance Agreement" and stated that Eastern would accept a regular monthly payment of $2,000 for a period of six months, with "[a]ll funds received under this Agreement [to] be applied to past due payments, late charges and advances at Eastern Savings Bank's sole discretion." It reiterated that it

"does not change the terms and conditions of the original loan documents."

The letter also made certain open-ended representations about Eastern's future actions and the possibility of a modification. Specifically, Eastern committed to review the loan in September and to consider modifying the terms of the loan, if Martin complied with the agreement. Eastern stated that the purpose of the agreement was "to determine your desirability to make timely payments" and that "[i]f payments are received as outlined, the loan may be reviewed for further workout options." Eastern expressly reserved the right to extend the forbearance agreement rather than modify the terms.

Martin then proceeded to make the agreed-upon $2,000 monthly payments, although there is some dispute as to whether all were timely made. After the six month forbearance period, Eastern extended its forbearance agreement two additional times on substantially identical terms after receiving updated financial information from Martin.

Then, in December 2010, Eastern extended the Forbearance Agreement for a fourth time, this time increasing the minimum monthly payment to the original monthly payment of $3,124.19. By this point, Martin's arrearage had increased from $11,771.93 as of the March 6, 2009 letter to $45,696.49. After review of Martin's financial information, which had led to the increase of

his monthly payment, Eastern also determined that his loan was not eligible for a modification.

Martin made one payment under the new arrangement and then again defaulted on his obligation. Martin and Eastern engaged in additional negotiations over his mortgage payments, but were unable to reach an agreement. In response, Eastern began the foreclosure process. On February 9, 2011, Eastern sent Martin a 150-Day Notice of Right to Cure pursuant to Mass. Gen. Laws ch. 244, § 35A. When Martin failed to cure within 150 days, Eastern took the additional steps necessary to foreclose, including complying with the Servicemembers Civil Relief Act., 50 U.S.C. App. § 501, *et seq.*, and publishing and mailing notice of the foreclosure sale as required by Mass. Gen. Laws ch. 244, § 14. The property was sold at auction on April 16, 2013, and Eastern was the successful bidder. Eastern assigned its bid to Sunningdale, an operating subsidiary, and the requisite deeds and affidavits were recorded with the Essex County Registry of Deeds on May 1, 2013. Martin refused to vacate the home, and this suit followed.

Martin's ultimate contention is that, but for his misapprehension that a mortgage modification was coming, he would have been able to avoid foreclosure. He says a family member would have helped him refinance or stay current on his payments in order to avoid the significant costs of default and

foreclosure.  Only because he was misled, he asserts, did he
fall so far behind and lose his home.

## II. PROCEDURAL HISTORY

Eastern initially filed a summary process action for
possession, pursuant to Mass. Gen. Laws ch. 239, in
Massachusetts Housing Court.  In response, Martin asserted,
among other things, that Eastern could not demonstrate that the
foreclosure complied with the requirements of Mass. Gen. Laws
ch. 183, § 21 and Mass. Gen. Laws ch. 244, §§ 35A and 35B.
Because Martin's allegations of non-compliance with § 35A raised
potential issues concerning pursuit of a summary process action
in the Housing Court, *cf. U.S. Bank Nat'l Ass'n.* v. *Schumacher*,
5 N.E.3d 882 (Mass. 2014), Eastern elected voluntarily to
dismiss that action and litigate this diversity matter in this
court as a court of general jurisdiction competent to dispose of
all claims.

On January 6, 2014, Judge Tauro denied Martin's motion to
dismiss for lack of subject matter jurisdiction.  The case was
then reassigned to Judge Young, who granted a motion to dismiss
counts three and five of Martin's counterclaim which alleged
fraudulent conveyance and civil RICO violations.

After the case was then assigned to my session, I granted
Sunningdale's motion for use and occupancy payments, set at
$1,600 monthly, pending resolution of the case.  Before me is

Sunningdale's motion for summary judgment as to all remaining claims and counterclaims.  As one dimension of his opposition to summary judgment, Martin sought a continuance to conduct additional discovery.  I turn to the discovery question first.

### III. CONTINUANCE FOR ADDITIONAL DISCOVERY

To obtain a continuance of summary judgment disposition under Rule 56(d), a party must show "(i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending summary judgment motion." *Rivera-Torres* v. *Rey-Hernandez*, 502 F.3d 7, 10 (1st Cir. 2007).  The party opposing summary judgment must also show due diligence in conducting discovery and pursuing an extension of time for additional discovery.  *Id*. at 11.

Martin has failed to satisfy this standard.  Despite a substantial passage of time since the filing of Sunningdale's motion for summary judgment, he has provided no sufficiently concrete basis for believing that additional facts exist or how those facts could defeat summary judgment.  He has only provided conclusory statements that the case is in an early posture, "that there are plausible bases for his belief that there are facts, discoverable within a reasonable time, which, if

obtained, will suffice to engender an issue both genuine and
material," and requests that "if any discovery is needed to
establish the existence of a genuine dispute of material facts,
that decision on the summary judgment motion should be deferred
. . . ." But "[s]peculative conclusions, unanchored in facts,
are not sufficient" to secure a continuance under Rule 56.
*Rivera-Torres*, 502 F.3d at 12. Without any meaningful
description of what discoverable facts are necessary to oppose
summary judgment, a continuance is unwarranted. I now turn to
consideration of Sunningdale's motion for summary judgment.

### IV. STANDARD OF REVIEW

A movant is entitled to summary judgment "if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. Rule Civ. P. 56(a). If the movant meets this burden, "the
opposing party can then defeat the motion by showing that there
is a genuine issue of material fact." *Rivera-Colon* v. *Mills*,
635 F.3d 9, 12 (1st Cir. 2011). An issue is genuine "if a
reasonable jury could resolve the point in favor of the
nonmoving party." *Tropigas de P.R., Inc*. v. *Certain Underwriters
at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011). A fact
is material if "its existence or nonexistence has the potential
to change the outcome of the suit." *Borges* ex rel. *S.M.B.W.* v.
*Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010).

"In evaluating whether there is a genuine issue of material
fact, the court examines the record — pleadings, affidavits,
depositions, admissions, and answers to interrogatories —
viewing the evidence in the light most favorable to the party
opposing summary judgment." *Rivera-Colon*, 635 F.3d at 12
(citations omitted).  However, I may "afford no evidentiary
weight to 'conclusory allegations, empty rhetoric, unsupported
speculation, or evidence which, in the aggregate, is less than
significantly probative.'"  *Tropigas de P.R., Inc.*, 637 F.3d at
56 (quoting *Rogan* v. *City of Boston*, 267 F.3d 24, 27 (1st Cir.
2001)).  Thus, in order to meet its burden, the nonmoving party
"must point to competent evidence and specific facts."  *Id.* at
56.

## V. THE POSSESSION CLAIM

Sunningdale seeks possession of the real property located
at 38 Hesper Street in Saugus, Massachusetts.  To make out its
prima facie case, it must show that "it obtained a deed to the
property at issue and that the deed and affidavit of sale,
showing compliance with statutory foreclosure requirements, were
recorded." *Bank of New York* v. *Bailey*, 951 N.E.2d 331, 336-7
(Mass. 2011).  It is uncontested that Sunningdale obtained a
Foreclosure Deed for the property on May 1, 2013, which it
recorded with the Essex County Registry of Deeds, and that a
Confirmatory Foreclosure Deed, including an affidavit of sale,

was recorded on September 27, 2013.[3]  Sunningdale has established

its prima facie case for possession.[4]

However, to foreclose upon a property, a mortgagee must

also "act in good faith and . . . use reasonable diligence to

protect the interests of the mortgagor."  *U.S. Bank Nat'l Ass'n*

v. *Ibanez*, 941 N.E.2d 40, 50 n.16 (Mass. 2011).  This duty is

heightened when the mortgagee itself buys the property.  *Id*.

"When a party who is intrusted with a power to sell attempts

also to become the purchaser, he will be held to the strictest

good faith and the utmost diligence for the protection of the

rights of his principal."  *Williams* v. *Resolution GGF OY*, 630

N.E.2d 581, 584 (Mass. 1994) (quoting *Union Market Nat'l Bank of*

---

[3] Under Local Rule 56.1, a fact asserted in a statement of
uncontested material facts which is not controverted by the
opposing parties is deemed admitted for the purposes of summary
judgment.  These facts were included in Sunningdale's statement
of undisputed material facts and neither denied nor contradicted
by Defendant's filing.

[4] Possession does not require showing compliance with Mass. Gen.
Laws ch. 244 § 35A.  A homeowner can generally challenge a
foreclosing mortgagee's non-compliance with § 35A only in a
separate suit or counterclaim, not as a defense to possession.
*U.S. Bank Nat'l Ass'n* v. *Schumacher*, 5 N.E.3d 882, 884 (Mass.
2014).  While a § 35A violation that renders the foreclosure "so
fundamentally unfair that the former homeowner is entitled to
affirmative equitable relief" can void a sale, no such violation
is alleged here.  *Wells Fargo Bank, N.A.* v. *Davies*, 6 N.E.3d
570, at *1 (Mass. App. Ct. 2014) (per curiam) (quoting
*Schumacher*, 5 N.E.3d at 891).  Moreover, for loans originated
prior to the enactment of the Dodd-Frank Act, § 35A is preempted
by regulations promulgated under the Home Owners' Loan Act.
*Sovereign Bank* v. *Sturgis*, 863 F. Supp. 2d 75, 102-03 (D. Mass.
2012).  *See generally infra* note 6 and accompanying text at 17.

*Watertown v. Derderian,* 62 N.E.2d 661, 663 (Mass. 1945)

(internal citations omitted); *Montague* v. *Dawes*, 14 Allen 369,

373 (Mass. 1867)).  Failure to act in good faith can invalidate

the foreclosure sale.  *Sandler* v. *Silk*, 198 N.E. 749, 751 (Mass.

1935).

Martin contends that Sunningdale and Eastern failed to act

in good faith and with reasonable diligence in protecting him

and that they should therefore be denied possession.  Such

contentions are generally viewed as raising questions of fact.

*Oyegbola* v. *DeSimone*, 1996 Mass. App. Div. 67, at *3 (Dist. Ct.

1996).

Massachusetts courts have developed guidance for

identifying behaviors that constitute less than good faith by a

mortgagee in this context.[5]  In this connection, that a property

is sold at auction for less than its full market price does not

necessarily indicate bad faith or lack of diligence, even where

there is an extreme disparity between the sale price and the

market price, although the disparity can be evidence to support

a finding of bad faith.  *Seppala & Aho Constr. Co.* v. *Petersen*,

367 N.E.2d 613, 620 (Mass. 1977).  Similarly, lack of bidders at

---

[5] The First Circuit has explained that the duty of a mortgagee to
act in good faith and use reasonable diligence is distinct from
the implied covenant of good faith and fair dealing.  *MacKenzie*
v. *Flagstar Bank, FSB*, 738 F.3d 486, 493 n.4 (1st Cir. 2013).  I
discuss only the former duty here.

the auction proof is not in and of itself bad faith, although that too can be relevant proof. *Cambridge Sav. Bank* v. *Cronin*, 194 N.E. 289, 290 (Mass. 1935). Sales have generally been invalidated only where "the bad faith or failure of diligence has been of an active and conspicuous character." *Pemstein* v. *Stimpson*, 630 N.E.2d 608, 611-12 (Mass. App. Ct. 1994). Generally, "the mortgagee is given much leeway." *Id*. at 61 (quoting *In re Gen. Indus., Inc*., 79 B.R. 124, 132 (Bankr. D. Mass. 1987)). That said, separate acts which taken alone would not show a lack of good faith may constitute such a showing when taken together. *DesLauries* v. *Shea*, 13 N.E.2d 932, 937 (Mass. 1938).

In this case, Martin identifies two separate acts he says show a lack of good faith. First, he points to Eastern's alleged failure to provide notice of the foreclosure to his parents, who were junior mortgagees, as evidence of bad faith. There is some support for this contention in the case law.

In *Sandler* v. *Silk*, 198 N.E. 749 (Mass. 1935), the Supreme Judicial Court upheld a finding of bad faith where a junior mortgagee was not notified of the foreclosure. While the mortgagee was not obligated to give her notice, she had specifically requested to be notified of a foreclosure in order to be able to purchase the property. *Id*. at 751. The failure to notify was found to be part of an effort to purchase the

property at a below-market price.  The evidence of bad faith was materially more extensive in *Sandler*, however, than exists on the record here.

But there is no evidence here that Martin's parents had specially requested notice of foreclosure, nor had they stated an intent to purchase the property.  There is also no evidence of a "concerted plan" by Eastern and Sunningdale to deny them notice.  *Id.*  On the contrary, in an affidavit, Eastern attests that notice of the foreclosure sale was sent to Martin's parents on April 3, 2013.  Attached to the affidavit is a copy of the certified mail receipts as well as the USPS tracking information.  The notice was sent to 5 Ekstrand Road in Saugus, the same address Martin admitted in his answer that he was temporarily staying at with his father.  The evidence of record before me cannot provide grounds for a finding of bad faith on the basis of an unsupported claim that Martin's parents did not receive requested notice.

Second, Martin contends a lack of good faith and diligence might also be found in Eastern's unwillingness at least to defer its foreclosure auction in the face of an offer to purchase the house.  Through the broker, Martin received a written offer on the property for $307,000 on the day before the foreclosure sale was scheduled to take place.  He forwarded the offer to Eastern,

but Eastern chose not to accept it or to delay the foreclosure. The price at which Eastern purchased the property was $270,000.

Courts have refused to find a lack of good faith in a failure to postpone a foreclosure sale where there was no prospective purchaser or other reason to think that more favorable terms could be obtained. *DesLauries*, 13 N.E.2d at 936 ("there was no evidence that the circumstances at an adjourned sale were likely to be more favorable"); *Oyegbola* v. *DeSimone*, 1996 Mass. App. Div. 67, at *4 (Dist. Ct. 1996)("[t]he record in this case is devoid of any indication beyond the plaintiff's sheer speculation that there was any prospective purchaser who would have bid more than the price paid by the defendants.").

An implication of these cases may be that when there is such a prospective purchaser shown, a mortgagee's failure to take the higher offer or at least put off the sale might constitute bad faith. Indeed, in the most favorable conditions — where a buyer had legally bound himself to purchase the property, not contingent on securing financing, and would pay a price sufficient to give the mortgagee full recovery — a Massachusetts Superior Court Judge *sua sponte* found bad faith and directed summary judgment for the non-moving plaintiffs in the case. *Snowden* v. *Chase Manhattan Mortg. Corp.*, No. CIV.A. 03-0001B, 2003 WL 22519518, at *4 (Mass. Super. Ct. Nov. 5, 2003).

Here, Eastern references evidence that Martin unsuccessfully attempted to sell the property through a short-sale on three separate occasions.  Martin had actually been involved in a Chapter 13 Bankruptcy; Eastern and a bankruptcy court judge approved one of the three attempted short-sales. However, Martin failed to consummate the approved short-sale. Other proposals came to Eastern on the day prior to the scheduled foreclosure sale.  The specific potential put in issue here involved a buyer who approached Martin but was still offering only a short-sale, and one contingent on financing at that.  Even under the broadest reading of *Snowden*, a mortgagee who ignored a contingent purchase offer given such a history of aborted sales initiatives by the mortgagor, cannot be said to have been a pattern of acting in bad faith.  These attempts suggest pretextual purported sale "opportunities" designed to forestall foreclosure rather than actually to raise funds to satisfy a mortgage.

Even drawing all reasonable inferences in favor of Martin, Eastern and Sunningdale have satisfactorily demonstrated as a matter of law that they acted in good faith in the sale.  This conclusion also bars Martin's §93A counterclaim insofar as it specifically arises out of the foreclosure sale.

# VI. MARTIN'S COUNTERCLAIMS

## A. *Preemption*

For his part, Martin has raised a number of state law counterclaims against Eastern and Sunningdale, arising out of what he contends to be misleading negotiations over mortgage forbearance and modification plans. As a threshold matter, I must first address whether these state law causes of action are preempted by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461 *et seq*. I addressed the preemptive effects of HOLA at length in *Sovereign Bank v. Sturgis*, 863 F. Supp. 2d 75 (D. Mass. 2012), applying the three-step analysis outlined by the Office of Thrift Supervision regulations, and need not restate that analysis here.[6] The first count, alleging fraud and misrepresentation, and the fourth count, alleging breach of the covenant of good faith and fair dealing and promissory estoppel, arise under generally applicable commercial and tort law that affect lending only incidentally and are not preempted. 12

---

[6] That analysis is unaffected by the Dodd-Frank Act, Pub. L. 111-203 (2010), which substantially reduced the preemptive effect of HOLA. Where loans originated prior to the enactment of the Act, as here, the older HOLA preemption regime remains applicable. *Sturgis*, 863 F. Supp. 2d at 91 n.9; *Henning* v. *Wachovia Mortg., FSB*, 969 F. Supp. 2d 135, 146 (D. Mass. 2013) ("Courts have uniformly held, however, that the provisions of Dodd-Frank are not retroactive, and HOLA preemption applies to mortgages originated before either July 21, 2010 or July 21, 2011."). Martin's mortgage is unaffected by Dodd-Frank because it originated in 2003.

C.F.R. 560.2(c).  The counterclaim under § 93A does not attempt to "shoehorn" a preempted state law claim into a consumer protection law, a circumstance which would preempt the counterclaim; rather, it takes the form of a more general assertion of unfair commercial negotiations, as to which HOLA and OTS allow scope under state law.  *Sturgis*, 863 F. Supp. 2d at 98.  I conclude preemption provides no grounds for summary judgment here.

**B.    *Misrepresentation and Fraud***

Passing preemption and moving on to the merits, Martin claims that Eastern's communications with him concerning a workout for his loan constituted fraud, intentional misrepresentation, and/or negligent misrepresentation.  To show fraud or intentional misrepresentation, a plaintiff "must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage."  *Damon* v. *Sun Co*., 87 F.3d 1467, 1471-72 (1st Cir. 1996) (quoting *Barrett Assocs., Inc*. v. *Aronson*, 190 N.E.2d 867, 868 (Mass. 1963)).  This standard has been interpreted to require reasonable reliance.  *Kennedy* v. *Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1987).

Negligent misrepresentation requires a plaintiff to prove
that the defendant "(1) in the course of his business, (2)
supplied false information for the guidance of others (3) in
their business transactions, (4) causing and resulting in
pecuniary loss to those others (5) by their justifiable reliance
on the information, and that he (6) failed to exercise
reasonable care or competence in obtaining or communicating the
information." *Gossels* v. *Fleet Nat'l Bank*, 902 N.E.2d 370, 377
(Mass. 2009).

Both causes of action require that the plaintiff reasonably
or, alternatively stated, justifiably relied on the alleged
false statements. Ordinarily, the reasonableness of reliance is
a question of fact. *Rodi* v. *S. New England Sch. of Law*, 389
F.3d 5, 16 (1st Cir. 2004). Here, however, I conclude as a
matter of law that Martin cannot show reasonable reliance. To
be sure, Martin avers that he was not looking for temporary
forbearance, that he never discussed a temporary solution with
Eastern, and that he believed that he was in a probationary
period that would lead to a modification. The evidence of
record, however, does not support him.

The documentary evidence makes clear that Martin was only
offered the possibility of a modification, not the promise of a
modification. *See generally, In re Brandao*, 567 B.R. 396, 406
(Bankr. D. Mass. 2017) (emails from mortgagee showed that it

presented postponement of foreclosure sale merely as a possibility). The handwritten note of uncertain provenance at the bottom of the February 10, 2009 letter from Eastern to Martin stating "$2000 per month/6 months – possible mod after fulfilled" does not suggest more than what is says: a possibility. The March 6, 2009 letter from Eastern, which purports to confirm the terms arranged in a telephone call, states that "ESB will consider modifying your loan terms" based on compliance with a forbearance agreement, but that "we reserve the right to extend the agreement." In the next bullet point, that letter again says that "the loan may be reviewed for further workout options." These terms raise the possibility of a mortgage modification but provide no firm and enforceable promise of modification in the future. The same language is repeated in successive communications from Eastern.

Martin's own *post hoc* statements about his subjective beliefs, standing alone against these documents, are not enough to raise a genuine issue of fact as to whether any false statement was made concerning Martin receiving a mortgage modification.[7] Martin's *post hoc* assertion that an oral promise

_____

[7] There is in fact evidence to support the proposition that Martin himself understood the temporary nature of the relief he had received from Eastern. A fax Martin sent Eastern on April 20, 2010, informing the bank of his new employment and hoping to "talk about straightening out this mess" in light of the new circumstances certainly demonstrates a recognition by Martin

of modification was made initially, is contrary to the subsequent written evidence. Even if such a promise were made in Martin's original telephone conversations with Eastern, expressly or through more subtle misrepresentations, his reliance on those conversations was unreasonable in the face of successive, unambiguous written communications plainly denying any promise of a permanent modification. Those letters should have, at a minimum, prompted Martin to investigate further. *Trifiro* v. *N.Y. Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988) ("Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying.") Without any possibility of showing reasonable reliance, Martin's misrepresentation claims cannot survive summary judgment.

**C.  Chapter 93A**

Based upon the same allegations of misrepresentation in the negotiations over a mortgage workout, Martin also makes claims under Mass. Gen. Laws ch. § 93A, the state's consumer protection law. Chapter 93A provides a cause of action where a person has been injured by an unfair or deceptive act or practice. *Hershenow* v. *Enter. Rent-A-Car Co. of Bos., Inc*., 840 N.E.2d 526, 528 (Mass. 2006). Reliance is not a necessary element of a

---

that no final agreement for permanent modified mortgage had been reached.

ch. 93A claim; ch. 93A is consequently broader than common-law fraud. *Id.* at 534 n.20. Thus, the above misrepresentation analysis, resting on a lack of reasonable reliance, does not dispose of Martin's counterclaim under ch. 93A.

Moreover, it is clear that if Martin's allegations were true, he would be able to establish a ch. 93A violation. In *Bosque* v. *Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342 (D. Mass. 2011), the plaintiff homeowners alleged that they were led to believe that if they complied with certain obligations, they would be entitled to a permanent mortgage modification from their lender under the federal HAMP program or an outright denial on that request, when in fact, compliance would not trigger any such outcomes. *Id.* at 353-54. "These allegations are plainly sufficient to state a claim under ch. 93A for unfair or deceptive practices." *Id.*; *see also Okoye* v. *Bank of N.Y. Mellon*, No. CIV.A. 10-11563-DPW, 2011 WL 3269686, at *9 (D. Mass. July 28, 2011) (collecting cases stating same proposition). If Eastern similarly led Martin to believe that his participation in the forbearance program would lead to a permanent mortgage modification, that would be an unfair practice, one prompting borrowers to sink further into arrearage in pursuit of an unforthcoming writedown.

It is equally clear that in the absence of such assurances of a modification, there would be no unfair or deceptive act.

There is no obligation to restructure or even extend the terms of a loan agreement under ch. 93A. *Carney* v. *Shawmut Bank, N.A.*, 893 N.E.2d 802 (Mass. App. Ct. 2008)(per curiam). Nor do "[h]ighly generalized expressions of good will such as, 'We'll work with you,'" create ch. 93A liability when a workout is not reached. *Hogan* v. *Riemer*, 619 N.E.2d 984, 989 (Mass. App. Ct. 1993). This is all the more so where the written communications between Martin and Eastern explicitly disavow any promise of a permanent modification. It would take meaningful and concrete statements by a lender to "cause a borrower of ordinary perspicacity, who signs highly specific loan documents, reasonably to believe that the documents are without meaning." *Id.* But for Martin's affidavit statements that he believed he was on the path to a permanent modification, there would be no evidence intimating a ch. 93A violation.

Martin's affidavit is not enough to forestall summary judgment. He does not identify meaningful and concrete statements from which a reasonable juror could conclude the highly specific subsequent documentation should be disregarded. To be sure, the March 6, 2009 letter memorializing the conversation between Martin and Eastern shows that some discussion occurred about the possibility of a modification. Likewise, although the handwritten note at the bottom of the initial February 10 letter, which states "possible mod after

fulfilled," might be read to suggest that the first six month period was discussed as preceding a *possible* permanent modification, such a possibility is inadequate grounds on which to base a ch. 93A claim of this sort. Such preliminary discussions and — at best — ambiguous contingencies concerning whether Eastern merely raised the possibility of a modification or intimated that a modification would be likely are, in any event, definitively superseded. Subsequent writings emphasizing Martin was not entitled to a modification also state that the forbearance was agreed to in order "to determine your desirability to make timely payments."

Martin's counterclaim also alleges ch. 93A violations based on violations of specific statutes and regulations. He claims that Eastern and Sunningdale violated 12 U.S.C. § 5536, a provision of the Dodd-Frank Act concerning unfair business practices. However, Dodd-Frank, which was enacted in 2010, is not retroactive. *Molosky* v. *Wash. Mut., Inc*., 664 F.3d 109, 113 n.1 (6th Cir. 2011). The Dodd-Frank Act does not cover this loan agreement or the 2009 conversation in which Eastern allegedly misled Martin about the forbearance agreements. Martin's counterclaims also cite a series of Massachusetts regulations defining unfair and deceptive practices for purposes of ch. 93A. Nothing alleged, much less nothing in the record evidence in support, matches these regulations. *See generally*

940 Mass. Code Regs. § 7.04 (1)(m) concerns unfulfilled threats by
creditors seeking additional payments; 940 Mass. Code Regs. §
7.07(1) concerns false representations that the creditor has
information or other things of value for the debtor; 940 Mass.
Code Regs. § 7.07(2) concerns false statements about the amount or
status of the debt; 940 Mass. Code Regs. § 7.07(3) concerns false
representations that a creditor is affiliated with a government
entity; 940 Mass. Code Regs. § 7.07(8) concerns false
representations in connection with the collection of any debt or
to obtain information concerning a debt, and 940 Mass. Code Regs. §
7.08 concerns the validation of debts.  Furthermore, 940 Mass.
Code Regs. § 3.16(4) concerns violations of the Federal Trade
Commission Act, the Federal Consumer Credit Protection Act, or
other Federal consumer protection statutes and 940 Mass. Code Regs.
§ 3.16(2) concerns failure to disclose to a buyer or prospective
buyer any fact which may have influenced the buyer not to enter
into the transaction.   These sections are plainly irrelevant to
the case at hand and, to the extent that Martin seeks to build a
ch. 93A claim on them, summary judgment is appropriate in favor
of Eastern and Sunningdale.[8]  Martin's 93A claim proceeds only on

---

[8] In briefing, Martin also raises the contention that Eastern
"pyramiding" of late charges was in violation of federal
regulation.  While Eastern disagrees about both the applicable
regulations and the characterization of its practices as
pyramiding, this dispute appears immaterial.  The "pyramiding"
accusation seems to be an effort to contest allegations by

the general allegation of unfair or deceptive acts or practices.

## D.   *Contract Claims*

Martin raises two contractual claims based on these same negotiations: breach of the covenant of good faith and fair dealing, and a promissory estoppel claim concerning his right to modification.   Neither is supported in the record.

### 1.   Covenant of Good Faith and Fair Dealing

Application of Massachusetts law clearly yields the result that there was no breach of the covenant of good faith and fair dealing.   "Good faith and fair dealing simply obligate each party to a contract not to act in such a way as to impair the other party's right to reap the fruits of the contract." *Fed. Nat'l Mortg. Assocs.* v. *Tong*, 799 N.E.2d 605, at *1 (Mass. App. Ct. 2003) (per curiam).   Where the original loan agreement contains no contractual obligation to provide a mortgage modification, there is no impairment of that right; the borrower reaps the fruit of the loan when he receives the funds to purchase their property.   *Id.; see also Adamson* v. *Mortg. Elec. Registration Sys., Inc.,* No. CIV.A. 11-0693-H, 2011 WL 4985490,

---

Eastern concerning Martin's payment history, not an independent claim of an unfair practice.   Because it is immaterial to decision of the matter before me how often Martin timely made his payments, I do not address whether Eastern's late charge practices were pyramiding or were unlawful.   The final resolution of any balance due must be resolved in other litigation if that becomes necessary.

at *4 (Mass. Super. Ct. Oct. 19, 2011). Sunningdale's motion for summary judgment will be granted on this claim.

### 2. Promissory Estoppel

Martin's promissory estoppel counterclaim fails to overcome a number of obstacles. First, establishing promissory estoppel, or, under Massachusetts terminology, detrimental reliance, *Loranger Constr. Corp.* v. *E. F. Hauserman Co.*, 384 N.E.2d 176, 179 (Mass. 1978), requires showing reasonable reliance. *See, e.g., Hinchey* v. *NYNEX Corp.*, 144 F.3d 134, 143 (1st Cir. 1998); *Kiely* v. *Raytheon Co.*, 105 F.3d 734, 736 (1st Cir. 1997) (per curiam). As discussed above, Martin's purported reliance on a telephone conversation with an Eastern representative was not reasonable, as a matter of law, given that he also received multiple written communications unambiguously denying that he had any expectation of a permanent mortgage modification. Although Martin persistently claims that he "was definitely not looking for a temporary solution which would have resulted in the accumulation in arrears," it is rather difficult to find merit in his argument when the letters from Eastern clearly set forth in the first sentence, his accumulated amount due, which only increased with each letter sent. This is sufficient to defeat a claim of detrimental reliance.

Moreover, even accepting Martin's full account of what occurred, there was not a sufficiently definite promise to

create a binding obligation through detrimental reliance.  Under

Massachusetts law, reliance replaces only consideration in

contract formation; the other elements of a contract must still

be proven.  *R.I. Hosp. Trust Nat'l Bank* v. *Varadian*, 647 N.E.2d

1174, 1179 (Mass. 1995).  One requirement for contract formation

is a promise that is "definite and certain."  *Lucey* v. *Hero

Int'l Corp.*, 281 N.E.2d 266, 269 (Mass. 1972).  Without well-

defined terms, the courts would be forced to "make for the

parties a contract which they did not make for themselves." *Id.*

(quoting *Read* v. *McKeague*, 147 N.E. 585, 586 (Mass. 1925)).  For

the same reason, an agreement-to-agree later is unenforceable,

*id.* at 270, as are for the most part, agreements to negotiate,

*Bell* v. *B. F. Goodrich Co.*, 270 N.E.2d 926 (Mass. 1971) (per

curiam).  Courts have consistently required that promises be

definite and certain to give rise to contractual liability under

a theory of promissory estoppel, as well as under ordinary

contract principles.  *See, e.g., Kiely* v. *Raytheon Co.*, 914 F.

Supp. 708, 712 (D. Mass. 1996), *aff'd*, 105 F.3d 734 (1st Cir.

1997) ("In the case of a contract formed by reliance, the

putative promise must . . . be definite and certain in its

terms"); *Moore* v. *La-Z-Boy, Inc.*, 639 F. Supp. 2d 136, 142 (D.

Mass. 2009).  Martin does not allege that Eastern promised him

any particular modification terms.  At most, Eastern promised

him that it would agree to negotiate over a later modification.

Under Massachusetts law, this is too vague to be enforced, even under a theory of detrimental reliance. A court would have to write all the essential terms of the modified loan agreement into the purported contract in order to reach the result Martin seeks.

Martin argues that this case should follow *Dixon* v. *Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 341 (D. Mass. 2011) in finding promissory estoppel and granting reliance damages where a mortgage lender allegedly strung along borrowers with promises to consider the borrowers' eligibility for a loan modification if they defaulted on their payments. But here there was no guarantee of a modification, much less a modification on specific terms, only an alleged promise to consider the borrower's eligibility for a modification. *Id.* at 343. Moreover, there are important differences between *Dixon* and this case.

First, in *Dixon*, the bank "never considered the plaintiff for such modification before beginning foreclosure proceedings." *Henning* v. *Wachovia Mortg., FSB*, 969 F.Supp.2d 135, 150 (D. Mass. 2013). Thus, even the open ended promise to consider the borrower for a modification was not kept. In this case, there is clear and unrebutted evidence that Eastern repeatedly sought financial documents from Martin and that it responded to changes in his economic situation, such as getting a new job, with

changes to his loan terms.  It is evident Eastern did consider
Martin for a mortgage modification in December 2010, although it
ultimately denied him that outcome.  To the extent Eastern's
"promise" was to consider Martin for a modification, under the
theory of *Dixon*, it is apparent on this record it did so.

Second, *Dixon* involved allegations of behavior that was
quite exploitative, and the need to protect principles of good
conscience played a significant role in that decision.  *Dixon*,
798 F. Supp. 2d at 344, 346-52.  There, the bank told homeowners
who were not previously in default to stop payments, then
immediately foreclosed upon them.  In contrast, Martin was
already in default when he spoke with Eastern.  Eastern then
entered into a series of forbearance agreements, which it
complied with, only foreclosing years later.  Without endorsing
or condemning Eastern's business practices, I find the record
clear that they were not in the manipulatively opportunistic
realm evident in *Dixon*.

Third, Martin has requested not only reliance damages,
which were granted in *Dixon*, but rather specific performance of
the purported contract in the form of a court-ordered
modification of the loan.  The *Dixon* court recognized that this
form of relief could not be granted.  *Id.* at 342.

Finally, Judge Young in *Dixon* also recognized that he was
stretching the law of Massachusetts, noting that its decision

was an "anomaly" and "in tension" with some Massachusetts doctrine. *Id.* at 344, 352. Stretching the law of promissory estoppel still further would be a fundamental departure from state law, which I am bound to apply. *Dixon* is not enough to show detrimental reliance under state law – even if that reliance could be shown to be reasonable, which it cannot – and summary judgment for Sunningdale is appropriate on both of Martin's contractual counterclaims.

## VII. CONCLUSION

For the reasons stated above, Sunningdale's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment for plaintiff Sunningdale and third-party defendant Eastern Savings Bank, on all claims asserted against or by the defendants with respect to them.


*__Douglas P. Woodlock__*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE